**Anthia VU and Hung T. Vu, Plaintiffs,**

v.

**The SINGER COMPANY, a corporation, doing business as or also known as the Singer Education Singer-Career Systems, Defendant.**

**No. C–79–2774 WHO.**

United States District Court, N. D. California.

Oct. 7, 1981.

**28**

Allen Ruby, Morgan Ruby Teter, Schofield, Franich, Bouchier & Fredkin, San Jose, Cal., for plaintiffs.

Edwin A. Heafey, Peter W. Davis, Richard de St. Phalle, Crosby, Heafey, Roach & May, Oakland, Cal., for defendant.

### OPINION

ORRICK, District Judge.

In this negligence action removed from state court on grounds of diversity of citizenship, plaintiffs, husband and wife, are suing The Singer Company ("Singer") which operates the Job Corps Center in San Jose (the "Center") for damages sustained when corpsmembers entered their house, raped Mrs. Vu, and stole many of their belongings. Singer moves for summary judgment on the issue of whether it owes a legal duty to plaintiffs to exercise due care. The Court grants defendant's motion for summary judgment, finding that there are no genuine issues of material fact and that as a matter of law Singer owed no duty of care to plaintiffs for the reasons set forth below.

### I

Enrollees in Jobs Corps Centers are youths with disadvantaged backgrounds who are provided with room and board at a Job Corps Center while attending vocational training classes or receiving on-the-job training. The Center structures their lives to a great extent. For example, corpsmembers must wake up at a certain time, must obtain a pass to leave the Center in the evenings, and may not own a car or bicycle. The United States Department of Labor contracts out the operation of its local centers to private corporations, and Singer operates the San Jose Center.

It is undisputed that on December 17, 1978, six male and several female corpsmembers consumed alcohol in nearby Williams Street Park and then entered plaintiffs' house, which is about seven blocks from the Center near the park, through an unlocked door and attacked Mrs. Vu who was alone. They took many of plaintiffs'

possessions and carried them back to the Center.

On December 18, a roommate of one of the female participants in the robbery reported to a security guard that someone had been murdered or attacked at plaintiffs' address by corpsmembers. The security guard passed this information on to the Center's security supervisor, Mr. Haynie, who in turn walked over to plaintiffs' home. Seeing a light on inside the house and seeing no sign of police activity, such as a seal on the door to suggest that someone had been murdered, he returned to the Center. He called the San Jose police and asked if a murder had been committed at plaintiffs' address. He was told no.

After personally talking with the roommate on December 19, Mr. Haynie repeated the same procedure of viewing plaintiffs' house, walking down several other streets in case the roommate had been mistaken as to the address, and called the San Jose police. The police again responded that no one had been murdered at plaintiffs' address. On December 21, he spoke with the female participant who denied involvement. Mr. Haynie stated in deposition that he thought someone was playing a joke.

The files produced by Singer show that a few months prior to the attack on Mrs. Vu, several of the attackers had returned to the Center under the influence of alcohol or drugs and had been involved in fights off Center grounds. Several had previously been convicted of theft. One of the attackers had in fact been either expelled or had resigned from the program. Because security personnel had not been so notified, the corpsmember still frequented the Center. Singer had also been aware that corpsmembers were drinking and fighting in Williams Street Park. Singer had placed the park off limits to corpsmembers and had begun irregular patrols of the park.

### II

Plaintiffs claim that Singer owes a duty to the residents in the surrounding community to exercise reasonable care in supervis-

ing and controlling the corpsmembers because Singer has placed a group of high risk youths with histories of instability, criminal activity, and substance abuse in the middle of a residential community. If the act of bringing together this high-risk group is insufficient to create a duty of care, plaintiffs contend that the regulations issued by the Department of Labor concerning community safety impose upon Singer a duty of care owed to plaintiffs as members of the class the regulation intended to benefit.

Singer breached its duty, according to plaintiffs, by failing to enforce its own disciplinary rules and those set out by the Department of Labor. At no time did Singer effectively expel any of the attackers or confine them to the Center despite their violation of regulations prohibiting alcohol, drug use, and fighting.

Plaintiffs further assert that Singer acquired a duty of care by voluntarily patrolling Williams Street Park to keep corpsmembers from congregating there and that Singer became liable for its subsequent failure to properly and regularly maintain the patrols.

If Singer could not control the corpsmembers, plaintiffs argue that it at least had a duty to warn the surrounding community of the potential danger from corpsmembers. If Singer had done so, plaintiffs contend, Mrs. Vu would not have stayed alone at night, nor would she have kept her door unlocked.

Finally, plaintiffs claim that Singer breached its duty to immediately report to the San Jose police that corpsmembers might be involved in the attack and robbery. Due to Mr. Haynie's failure to report the information he had received plaintiffs assert that many of their possessions were not recovered.

## III

■ It is well-settled that the existence of "duty" is a question of law. *Thompson v. County of Alameda*, 27 Cal.3d 741, 750, 167 Cal.Rptr. 70, 614 P.2d 728 (1980).[1] As often stated, duty is "only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." Prosser, Law of Torts 332–33 (3d ed. 1964), cited in *Dillon v. Legg*, 68 Cal.2d 728, 734, 69 Cal.Rptr. 72, 441 P.2d 912 (1968).

Although persons generally owe no duty to control the conduct of another, where the defendant stands in a special relationship to either the person whose conduct needs to be controlled or to the foreseeable victim of that conduct, the courts have sometimes imposed liability upon defendant. *See Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 435, 131 Cal.Rptr. 14, 551 P.2d 334 (1976).

■ The Court must balance the following factors when determining the existence of duty in each particular case: (1) foreseeability of harm to plaintiff; (2) degree of certainty that plaintiff suffered injury; (3) closeness of connection between defendant's conduct and injury suffered; moral blame attached to defendant's conduct; (5) policy of preventing future harm; (6) extent of burden to defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach; and (7) availability, cost, and prevalence of insurance for the risk involved. *Id.*[2]

---

1. Although foreseeability of risk, which is of primary importance in this case, is usually a question of fact, it becomes a question of law where reasonable minds cannot differ. *Richards v. Stanley*, 43 Cal.2d 60, 66–67, 271 P.2d 23 (1954). A finding of no duty of care as a matter of law is particularly common where, as here, defendant is alleged to be responsible for the conduct of a third person. *See Hooks v. Southern California Permanente Medical*

*Group*, 107 Cal.App.3d 435, 443, 165 Cal.Rptr. 741 (1980).

2. California case law does not clarify whether the Court should first determine if a special relationship exists between the defendant and the plaintiff or the tortfeasor and then consider whether defendant owes a duty of care to plaintiff by balancing the seven factors listed in *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 435, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). The *Tarasoff* court analyzed the

Plaintiffs' claim that Singer owed the surrounding community a duty to control the corpsmembers primarily founders on the element of foreseeability. Although Singer could possibly foresee the type of crime which the corpsmembers committed, it could not foresee that plaintiffs would be their victims.

The documents submitted show that almost all of the attackers had drug abuse problems and many of them had histories of theft. During their stay at the Center several engaged in fights and other confrontations.[3] One was convicted of theft in October. None of the physical violence was related to sexual assault.[4] Given their backgrounds, it was foreseeable that some of the corpsmembers would continue to en-gage in theft. However, Singer could not necessarily predict that corpsmembers would resort to rape from their histories of property theft. *See Kane v. Hartford Accident & Indemnity Co.*, 98 Cal.App.3d 350, 356–57, 159 Cal.Rptr. 446 (1979) (court held that even if defendant had performed a background check on a hospital employee and discovered his prior record of theft before bonding him, the employee's rape of plaintiff at the hospital would not have been a foreseeable risk because only property theft against the hospital, rather than physical violence, would have been foreseeable). The physical violence chronicled in Singer's records on the corpsmembers involved adolescent confrontations which, although potentially lethal, were not comparable to sexually assaulting a stranger.[5]

special relationship between a therapist and patient apart from the question of foreseeability. *Id.* at 435, 131 Cal.Rptr. 14, 551 P.2d 334. Subsequent cases have also examined the relationship between defendant and the tortfeasor separately, considering such factors as defendant's power to control the tortfeasor and the dependence of the tortfeasor upon the defendant. *See Harland v. State of California*, 75 Cal.App.3d 475, 481, 142 Cal.Rptr. 201 (1977); *Buford v. State of California*, 104 Cal.App.3d 811, 823–24, 164 Cal.Rptr. 264 (1980). But other courts have found that no special relationship existed by balancing the seven factors listed in *Tarasoff*. *See Beauchene v. Synanon Foundation, Inc.*, 88 Cal.App.3d 342, 347–49, 151 Cal.Rptr. 796 (1979).

The Court need not make a separate determination whether Singer and the corpsmembers shared a special relationship because the existence of duty is bottomed on foreseeability and the other considerations listed in *Tarasoff*. Even if a special relationship were present, the defendant is charged only with protecting a foreseeable victim from a foreseeable risk. *Id.* 17 Cal.3d at 435, 131 Cal.Rptr. 14, 551 P.2d 334.

3. John Hood was found intoxicated six times in a two-month period before the attack. Two counselors noted that he had physical confrontations when he drank. Plaintiffs' Exhibit 1. One counselor remembered Hood threatening staff members with bodily harm. Deposition of Barry Black at 219–22.

Robert Bristow had been put on probation in 1975 for purse snatching. Within a month preceding the attack, Bristow had been involved in several fights, one in Williams Street Park, and had been under the influence of alcohol and PCP. Plaintiffs' Exhibit 2.

Ernest Pizarro, Jr. was cited several times for substance abuse, both PCP and alcohol, at the Center. He fought with an "outsider" in front of the Center on the same day as the attack. One day later he was arrested and charged with robbery and assault in another incident, but the charges were then dropped. Plaintiffs' opposition brief at 19. He resigned from the Center on December 21, 1978, in lieu of going before a review board for his repeated substance abuse. Plaintiffs' Exhibit 3.

Timothy Cook had previously been convicted of automobile theft and being an accessory to a burglary. He had been caught drinking or smoking marijuana off Center several times. Plaintiffs' Exhibit 4.

Kenneth Auday pleaded guilty in San Jose Municipal Court to theft in October, 1978. He continually used drugs. Plaintiffs' Exhibit 5.

Don Perez had a conviction record replete with theft dating from age nine. He served three years at the Juvenile Ranch for attempted murder at the age of twelve. He was involved in a fight with noncorpsmembers who were at the Center on November 13, 1978. On November 17, 1978, he fought with other corpsmembers and brandished a knife. He resigned on December 4, 1978, in lieu of a review board hearing, but was still at the Center at the time of the attack. Plaintiffs' Exhibit 6.

4. As noted previously, Ernest Pizarro's discipline sheet reads "arrested Dec. 18, 1978 for assault, robbery & rape." The Court does not know why the charges were dropped, nor does it know if other corpsmembers were charged with the crime.

5. Although plaintiffs' brief asserts that several nights before the attack on Mrs. Vu a corpsmember robbed a resident on the street, plaintiffs submitted no evidence to substantiate this allegation. Plaintiffs' brief in opposition at 28.

Were the question of duty dependent solely upon the foreseeability of risk, the Court would deny defendant's motion for summary judgment because reasonable minds could differ on this issue.

██ However, Singer could not anticipate that plaintiffs in particular would be harmed even if the type of risk were certain. Plaintiffs argue that they belong to a class of people who were foreseeably threatened by the corpsmembers' behavior, that is, those residents who live between the Center and Williams Street Park.[6] In light of the fact that corpsmembers were prohibited from owning their own means of transportation, it is certainly more likely that any acts of violence committed by corpsmembers would be directed at nearby residents rather than at others across town. However, this likelihood is insufficient to impose a duty upon the defendant. In *Thompson, supra,* the court held that the county owed no duty to warn neighbors when it released a juvenile to his mother's custody even though the juvenile had threatened to kill a neighborhood child upon release and where the juvenile did, in fact, murder a child who lived several doors away within twenty-four hours of release. The court found that the county had no duty to warn when they released this potentially dangerous offender because he had made only a generalized threat to a segment of the population, rather than making a threat to a specific victim readily identifiable.

The *Thompson* holding forecloses plaintiffs' contention that Singer had a duty to warn the surrounding community. The possible scope of victims in *Thompson,* neighborhood children, is more narrow than the one plaintiffs suggest, all residents who live between the Center and Williams Street Park. But the holding is also pertinent to their claim of duty to control, because it is the obligation to protect a foreseeable victim from a foreseeable risk that triggers the burden of using reasonable means to discharge the obligation, be it warning or controlling. *See Tarasoff, supra,* 17 Cal.3d at 436, 131 Cal.Rptr. 14, 551 P.2d 334, where the court first determined that a duty to protect a specific victim existed and only then concluded that the duty could be discharged by a warning. Thus, if the county did not have an obligation to protect the neighboring children by warning them of the released juvenile's threats, it follows that the county need not have taken other steps such as supervising or controlling the juvenile, which is a more onerous duty.[7] There was simply no duty to protect.

In the instant case the record does not demonstrate that any corpsmembers ever harmed a resident apart from drunken brawls with peers. Thus, under the holding of *Thompson,* Singer had no duty to protect plaintiffs by supervising the corpsmembers because plaintiffs were not foreseeable victims.

The Court also notes that California courts have found that rehabilitation programs owe no duty of care to the community relying upon another element listed in *Tarasoff,* the extent of the burden to defendant and the consequences to the community of imposing a duty. *See Beauchene v. Synanon Foundation, Inc.,* 88 Cal.App.3d 342, 347–48, 151 Cal.Rptr. 796 (1979), in which the court held that a private rehabili-

---

Even robbery of a stranger differs significantly from sexual assault. If plaintiffs are referring to the incident for which Ernest Pizarro was arrested, they have not introduced enough supporting documents for the Court to determine whether the assault implicated the Jobs Corps at all.

**6.** Plaintiffs' brief in opposition at 24.

**7.** The Court recognizes that the less identifiable is a victim, the more difficult is the duty to warn because it is impractical to warn whole neighborhoods or blocks.

Even if a victim is not specifically known, the duty to control or supervise is not impossible, because the party charged with the duty knows *who* he or she must supervise. Nonetheless, the Court concludes that no duty arises to protect unforeseeable victims from third persons, by warning or supervision, because the burden of imposing liability upon a defendant for a third person's actions is too onerous without the foreseeability limitation.

**32**

tation program owed no duty to a person shot by a probationer who had escaped from the center either for accepting into the program a person who posed a high risk to the community or for failing to prevent his escape.[8] *Beauchene* is applicable to the facts of this case. Although corpsmembers are not necessarily in prisoner release programs, Job Corps is designed to rehabilitate former criminal offenders, drug users and ghetto youths. *See Gibson v. United States,* 567 F.2d 1237, 1245 n.13 (3d Cir. 1977), *cert. denied,* 436 U.S. 925, 98 S.Ct. 2819, 56 L.Ed.2d 768 (1978). A finding of liability on the part of Singer to victims of corpsmembers' crimes would jeopardize the program.

 A duty to control or supervise the corpsmembers does not arise from the provisions in the statute creating the Job Corps program, 29 U.S.C.A. § 923 *et seq.* (Supp. 1981),[9] or from the implementing regulations by the United States Department of Labor, 29 C.F.R. § 970.97(b). A court may impose as a standard of care upon a defendant the requirements of a statute or administrative regulation, only if the purpose of the statute or regulation is: (1) to protect a class of persons to which plaintiff belongs; (2) to protect the particular interest which is invaded; (3) to protect that interest against a particular danger; and (4) to protect that interest against the type of harm which flows from the danger. Restatement 2d, Torts § 286 at 25 (1966). Violation of the statute or regulation is evidence of negligence or may create a presumption of negligence. *See* Cal.Evid.Code § 669 (West 1968).

Plaintiffs argue that the enabling legislation sets forth a standard of care to which Singer must adhere. 29 C.F.R. § 97a.97(a) permits each center to adopt its own behavior code which must prohibit the possession of unauthorized goods, such as drugs, and assaultive behavior.[10] Section 97a.97(b) list various sanctions which may be taken against corpsmembers who violate the regulations, ranging from suspension of privileges and restriction to the center to discharge from the program. 29 U.S.C.A. § 932(a) and (b) (Supp.1981) require the centers to strictly enforce their behavior codes employing disciplinary measures. Plaintiffs assert that Singer violated the statute and the regulations by failing previously to take disciplinary action against the corpsmembers who later attacked Mrs. Vu when they were found drunk or in a drugged state at the Center or when they exhibited violent tendencies.

Plaintiffs also contend that they belong to the class of persons Congress intended to protect, that is, the surrounding community, because several sections of the enabling legislation evince a concern for community safety and good community relations. 29 U.S.C.A. § 927(a) (Supp.1981) excludes from the Job Corps those youths who are likely to engage in behavior "incompatible with the maintenance of sound discipline and satisfactory relationships between the Center * * * and the surrounding communities." 29 U.S.C. § 933 directs the Secretary of Labor to encourage good relations between the centers and the communities by setting up advisory councils composed partly of community members.[11]

---

**8.** "Although appellant's injuries may be grievous, of paramount concern is the detrimental effect a finding of liability would have on prisoner release and rehabilitation programs. Were we to find a cause of action state we would in effect be encouraging the detention of prisoners in disregard of their rights and society's needs. Each member of the general public who chances to come into contact with a parolee or probationer must risk that the rehabilitative effort will fail." *Beauchene v. Synanon Foundation, Inc., supra* n.2, 88 Cal.App.3d at 348, 151 Cal.Rptr. 796.

**9.** When Congress renewed the Jobs Corps program by Public Law 95–524, October 27, 1978, it revised and renumbered the sections. All statutes and regulations cited in this Opinion were in effect prior to October 27, 1978.

**10.** The Jobs Corps Residential Living Manual, published by the Department of Labor, also stated at page 85 that some disciplinary action must be taken if the rule against possession or consumption of alcoholic beverages within center boundaries is broken.

**11.** 29 U.S.C. § 933(2) directs the Secretary of Labor to assure that each center is run with

Even if Singer violated the enabling statute and the Department of Labor regulations by failing to discipline the assaulting corpsmembers for prior infractions, the violation does not amount to a breach of duty because plaintiffs are not members of the class for whose protection the statute and regulations were intended. A fair reading of the statute demonstrates that Congress intended primarily to protect the program and benefit the corpsmembers by maintaining good community relations. Community pressure to ban a Job Corps center from the neighborhood due to corpsmember incidents would undermine the program. Although the surrounding community indirectly benefits from this Congressional objective, the statute and regulations do not create a standard of care owed to the community, the breach of which would result in Singer's liability.

■ Plaintiffs also rely upon the doctrine that one who undertakes to render services to another necessary for the protection of the latter is liable for injuries caused by the negligent performance of the services, Restatement 2d, Torts § 324A (1966), to argue that once Singer began patrolling Williams Street Park it became liable to plaintiffs for its failure to continue the patrols. Plaintiffs cannot prevail on this claim because the "gratuitous undertaking" doctrine does not obviate the requirement that duty can only be predicated upon foreseeable harm to a foreseeable victim. *Kane, supra,* 98 Cal.App.2d at 357, 159 Cal.Rptr. 446. The undisputed facts in this case cannot support a finding of foreseeability.

■ Finally, plaintiffs urge that Singer owed them a duty to promptly notify the

San Jose police that corpsmembers had been involved in the robbery and assault. This duty arose, according to plaintiffs, from two sources. First, the Corpsmember Handbook states that the security staff works "very closely with the local police, FBI, and community to improve relationships between them and the youth at this Center." Second, the Center Security and Law Enforcement Guide for Job Corps published by the Department of Labor directs the center director to report the facts immediately to the appropriate regional and national office when "there are serious offenses which demand the attention of appropriate local law enforcement officials." [12]

Neither document articulates a standard of care owed to plaintiffs. The Corpsmember Handbook pronouncement that the security staff works closely with the local police is not a regulation; it is simply informational. *See Diamond v. Grow,* 243 Cal. App.2d 396, 401, 52 Cal.Rptr. 265 (1963) (list of "good operating practices" in a flight information manual published by the Federal Aviation Agency does not establish a standard of care).[13]

Plaintiffs are not members of the class the regulation intended to protect. The purpose of the regulation appears to be for purposes of internal management rather than assistance to law enforcement agencies. Nowhere is it apparent that either the regional or the national office would in turn report the serious offenses to local police or take other action against the corpsmember to protect the community. Thus, this case differs from *Derrick v. Ontario Community Hospital,* 47 Cal.App.3d 145, 151–54, 120 Cal.Rptr. 566 (1975), where the court held

several objectives, one of which is "affording the community a meaningful voice in Center affairs of direct concern to it, including policies governing the issuance and terms of passes to enrollees." *See also* 29 C.F.R. § 97a.99.

**12.** The Law Enforcement Guide, dated December, 1976, cites 29 C.F.R. § 97a.124(8) as the source of this reporting obligation. This is probably a typographical error because that subsection pertains to corpsmembers on probation or parole. Subsection (j), which requires the center director to report any serious incident affecting corpsmembers or the center to

the regional and national office defines "critical incidents" to include the arrest or taking into custody of corpsmembers or staff.

**13.** The only regulation pertaining to cooperation with the local law enforcement agencies is 29 C.F.R. § 97a.99(a) which directs centers to establish cooperative relationships with the police to insure backup support for emergencies at the center and to insure "the orderly processing of criminal offenses." This regulation is too vague to establish a standard of care.

that the hospital owed a duty of care to plaintiff, who caught a contagious disease from one of its patients, when it failed to report the patient's diagnosis to the local health officer as required by state law. The court found that the statute had been enacted to protect the public against the spread of contagious diseases because the local health officer had the power to isolate the contagious patient.

Even if the report requirement sets forth a standard of care owed to plaintiffs, plaintiffs do not complain that Singer failed to notify the regional or national office when Mr. Haynie learned that corpsmembers might have committed a crime. Rather, they contend that Singer should have notified the San Jose police, a duty not specified in the regulation. Thus, no duty arises from Singer's failure to notify the San Jose police about the information Mr. Haynie received.

For all of the foregoing reasons, the Court grants defendant's motion for summary judgment is granted.